## RITCHIE *a.* GARRISON.

*New York Superior Court; Special Term, March,* 1858.

### PLEADING.—INSOLVENT'S DISCHARGE.

Upon demurrer to one distinct defence separately set up, no resort can be had to other portions of the answer where no reference to such parts is made.[*]
Effect of a bankrupt's discharge obtained in one country, upon a debt contracted in another previously to the passage of the statute under which the discharge was obtained.[†]

---

[*] Compare the Xenia Branch Bank a. Lee, 7 *Ante*, 372, and Martin a. Mattison, 8 *Ante*, 3. The latter case was affirmed at the general term in July, 1859. Present, MASON, BALCOM, and CAMPBELL, JJ.
[†] Compare Ballard a. Webster, 9 *Ante*, 404.

Demurrer to part of an answer.

The complaint was as follows :

That at the several and respective times thereafter mentioned, the plaintiffs were, and now are, residents of the province of Canada, one of the colonial possessions of the kingdom of Great Britain, of which they are and always have been subjects.

That on the 21st of February, 1838, the plaintiffs recovered, in the Court of Queen's Bench, holden at Toronto, in the province of Upper Canada, within the jurisdiction of such court, a judgment for the sum of £282 5s. 7½d. current money, by reason of the non-performance of certain promises and undertakings, made by the defendant to the plaintiffs, together with a certain amount for costs.

That such judgment remains in full force and effect, in no wise satisfied, reversed, or annulled, as by an exemplification thereof, ready to be produced, would appear.

That the defendant has not paid the amount of such judgment, but still remains indebted to the plaintiffs therefor.

That the contract or undertaking upon which such judgment was had, was entered into between the plaintiffs and defendant in Upper Canada, and was there to have been performed.

Upon this judgment the present action is brought, and judgment sought for the amount, in dollars, with interest.

The portion of the answer demurred to sets forth a discharge, obtained by the defendant under the bankrupt law of the United States of 1841 ; and the discharge is set forth in proper form, and with proper averments as to jurisdiction and other particulars.

The plaintiffs demur to this part of the answer, " because the said discharge is no answer to the action on the facts set forth in the complaint."

*Mr. Buckly,* for the plaintiffs.

*Mr. Eager,* for the defendant.

HOFFMAN, J.—The demurrer is to be tested by the complaint, and the portion of the answer demurred to. I understand the rule to be, that upon a demurrer to one distinct defence sepa-

rately set up, no resort can be had to other portions of the answer, unless, perhaps, when by a distinct reference they are made part of that demurred to.

The clause of the act of Congress of 1841, relied upon to give force to the present · discharge, is as follows : " And such discharge and certificate, when duly granted, shall in all courts of justice be deemed a full and complete discharge of all debts, contracts, and other engagements of such bankrupt, which are provable under this act, and shall be, and may be pleaded as a full bar to all suits whatever ; and the same shall be conclusive evidence of itself in favor of such bankrupt." (Vol. V., 444, § 4.)

It may be useful to notice that the bankrupt law of 1800 was similar. It provided " that every such bankrupt should be discharged from all debts by him or her due or owing at the time he or she became bankrupt, and all which were or might have been proven under the said commission." (1 *Laws U. S. by Story*, 744.)

Any decision of the courts of the United States upon the construction of this bankrupt law, emanating from the Congress of the United States, would, I apprehend, be authority, and supersede any thing to the contrary in the decisions of our own State. (7 *Johns. Ch. R.*, 303.)

I presume it is to be treated as settled law that if a contract had been made in this country, and a discharge obtained in a foreign country, it would be unavailing in an action here.

This proposition is explicitly decided in McMillan ·*a.* McNeil. (4 *Wheat.*, 209.) McMillan obtained his discharge in England, under the bankrupt laws in November, 1812. In November, 1811, he had given bonds at the Custom House for duties, with McNeil as his security. The bonds were paid by McNeil after suit in 1813, and in 1817 he sued McMillan. The bonds fell due before the discharge in England.

Ch. J. Marshall said, " that as the certificate under the English bankrupt laws it had frequently been determined, and was well settled, that a discharge under a foreign law was no bar to an action on a contract made in this country." The suit was brought in Louisiana.

In Cook *a.* Moffatt (5 *How.* (*U. S.*) 295), it was decided that the insolvent law of Maryland could not discharge one of its

own citizens from a contract made in New York, with citizens of that State. The suit was brought in Maryland.

The goods were purchased in New York. The notes, though made in Baltimore, were delivered in New York, and payable there. They were governed by the law of that place.

The position was distinctly announced, that the State insolvent laws could have no effect to discharge a contract made before their enactment, or beyond their territory.

But while this is the proposition of the majority of the court, it is sufficient for the present case to notice that all concurred in holding, as Justice Woodbury and Justice Daniels hold, that the contract being a foreign one, could not be affected by the bankrupt systems of other States. I need not enter into the great and important differences in the views of the judges. Justice Woodbury treats the matter on the ground of settled international law, without reference to any constitutional question. The contract made in one place, cannot be affected by the bankrupt law of other countries.

So in a leading English case (Phillips *a.* Allan, 8 *Barnw. & C.*, 477), BAYLEY, J., said : " It was properly conceded that a discharge in a foreign country will not of necessity preclude an English creditor from suing in an English court, in respect of a debt contracted in England. It has been decided that a certificate under a commissioner of bankruptcy issued in Ireland, since the union, does not discharge a debt contracted in England. (Lewis *a.* Owen, 4 *Barnw. & A.*, 654.) But a discharge of a debt, pursuant to the provision of an act of Parliament of the United Kingdom, which is competent to legislate for every part of the Kingdom, and to bind the rights of all persons residing either in England or Scotland, and which purports to bind subjects in England and Scotland, operates as a discharge in both countries."

The interpretation of the decisions of the Supreme Court, given in the Court of Appeals in Donelly *a.* Corbett (3 *Seld.*, 500), may be usefully referred to. It was held that a State law, by which a debtor was discharged from his debts, was valid as respects contracts made after its passage between citizens of the same State, but invalid as to all contracts made elsewhere, where a citizen of another State is a party.

Justice Gardiner quotes Justice Johnson's statement of the

effect of Ogden *a.* Saunders, that as between citizens of the same State, a discharge of a bankrupt by the laws of that State is valid as it affects posterior contracts; as against citizens of other States, it is invalid as to all contracts. He then discusses the theory of bankrupt laws becoming part of the contract, and thinks that upon that theory, a creditor is as much to be considered recognizing a right to legislative prospectively, within a constitution, as to be governed by an existing law. Yet the United States courts had always held otherwise, as to laws passed subsequently. He adds, "The notion, however, that insolvent laws constitute part of the agreement of the parties, under any circumstances, has been considered as fallacious by judges of the court, in which the doctrine was first broached. (5 *How.* (*U. S.*), 311.) The permission accorded by these laws to a debtor to absolve himself is an act of sovereignty induced by considerations of public expediency. It is the exercise of a power not derived from or dependent upon contract, but beyond and in hostility to it. The public good, or the exigencies of a State may require the taking of private property without the consent of the owner, or the discharge of a debt without the consent of a creditor; but the idea that the justification in either case rests on contract, or depends upon the assent of the holder, has scarcely the merit of plausibility.

The dissenting reasoning of Chief-justice Taney in Cook *a.* Moffat, is, I presume, here alluded to. He says: "According to established principles of jurisprudence, such laws have always been held valid and binding within the territorial limits of the State by which they are passed, although they may act upon contracts made in another country, or upon the citizens of another nation; and they have never been considered on that account as an infringement on the rights of other nations or their citizens. But beyond the limits of the State they have no force except such as may be given to them by comity."

And Judge Story in his Treatise on the Conflict of Laws observes: "If the State, by its own laws should provide that a discharge of an insolvent debtor, under its own laws, should be a discharge of all contracts, even of those made in a foreign country, its own courts would be bound by such provisions." (§ 388.)

If this is the theory of the law upon this subject—if it is the mere exercise of a sovereign power, from reasons of expediency

which the depository of that power is alone to judge of, then, at least, the provisions which discharge a contract made beyond its territory with a citizen of another State, and made before the enactment, should be so explicit and positive as to leave no possibility of any other conclusion.

In this view, we come to a question of construction, and there are several decisions, some in our own State, which tend to illustrate it.

In Penniman *a.* Meigs (9 *Johns.*, 325), the defendant had obtained his discharge in November, 1811, under the insolvent law then in force. This must have been either that of April 3, 1801 (*Sess. Laws, 24th Sess.*, 131); or that of April 3, 1811 (*Sess. Laws, 34th Sess.*, 200). The court held that it was bound to consider a discharge under the insolvent act of this State as a bar to all suits brought here upon antecedent contracts, wherever made. The statute was peremptory, and binding on our courts. It was for the Legislature to say whether foreign contracts should be exempted from the operation of our insolvent law, but it has not made any such exception.

The act of 1801 provided, " that the court should discharge such insolvent from all debts due at the time of the assignment, or contracted for before that time, and payable afterwards." The act of 1811 (*34th Sess.*, 201, § 3), is, in this particular, nearly in the same language.

Although the *decision* in Penniman *a.* Meigs is not now law, as Chancellor Kent observes, in Hicks *a.* Hotchkiss (7 *Johns. Ch. R.*, 297), being overruled by McMillan *a.* McNiel (before cited), yet it is overruled by the construction of the constitution of the United States. As a rule of interpretation of a statute, if valid, it remains untouched.

And accordingly, in Murray *a.* De Rottenham (6 *Johns. Ch. R.*, 59), Chancellor Kent cites and adopts it. He says, " that the insolvent act referred to in that decision did not expressly include foreign debts contracted abroad any more than the Bankrupt Act of the United States. It used only general language. It was a decision well considered at the time, and the language in which it was expressed was carefully selected."

He expressly decided in that case, that the certificate of discharge under the bankrupt act of 1800 was a bar to foreign as well as domestic creditors. " That act is general in its terms,

and applied to all debts which were, or might have been proved under the commission." I do not apprehend that we are to require an express declaration of the Legislature that foreign creditors are included in the operation of a bankrupt law, when the language of the statute is otherwise sufficiently general and comprehensive.

It is very difficult to reconcile this opinion with that expressed by the same eminent jurist in McMenomy *a.* Murray (3 *Johns. Ch. R.*, 440). He there says, "These debts (*by Speyer*) were contracted in Germany, and payable in Germany; and the discharge of Speyer by the bankrupt law of this country will not discharge him from those debts, unless those foreign creditors have assented to that proceeding, by coming in and proving their debts. A bankrupt or insolvent act ought not to be presumed to have been intended to reach foreign contracts, unless it be so declared."

It may not be useless to notice, that the law in our State was so altered in the revision of 1813, as to provide that foreign, as well as domestic debts should be discharged, if two-thirds of all the creditors in amount, including such debts, had united in the petition. (1 *Rev. L.*, 464, § 8.) But in 1830, the system was changed, and under it the demands of foreign creditors, upon debts contracted elsewhere, are not affected, unless they have united in the petition, or accepted a dividend, or unless the contract was to be performed here, or the creditor had become a resident prior to the publication of the first notice. (2 *Rev. Stat.*, 22, § 30.)

The revisors say that the whole current of authorities settles beyond dispute that foreign creditors cannot be affected by a discharge without their consent. (Vol. III., 617.)

Upon the question of the construction and extent of the statute, the case of Reimsdyck *a.* Kane (1 *Gallison R.*, 371) is of importance. Justice Story there says:

"Every State has within its own sovereignty an authority to bind its citizens everywhere, so long as they continue their allegiance. It may act upon the contract made with its own citizens in every country, and consequently may discharge them by general laws. But such is not the operation of jurisdiction in contracts made by a citizen with a foreigner, in a foreign country. If, in such a case, the legislature, by positive law, nullify

such contracts, it is certain that they cannot be enforced within its own tribunals. But if a statute be general without a direct application to foreign contracts, the rule approved by Casaregis seems proper to be adopted, that its construction should not be extended to such contracts. *Ratio est, quia statutum intelligit semper disponere de contractibus factis intra, et non extra territorium suum.* (*Casaregis Dis.*, 130, §§ 14, 15, 16, 20, 22.)"

As a rule of construction of the statute in question, the authorities upon the act of 1800, and our own State law, are so controlling that I do not feel at liberty to differ from them. The language of the present statute is nearly identical with that of the previous act. The discharge affects whatever debts could have been proven. (*Laws of U. S.*, vol. 5, 444, § 4.)

Upon the question whether the act can, upon the doctrines of general international law, be extended to foreign contracts, the authorities seem also controlling. Yet in the Court of Appeals in Maryland a different doctrine has been declared. (Lizardi *a.* Cohen, 3 *Gill's Maryl. R.*, 43; *Court of Appeals*, 1845.) Bills were drawn in New York, by Josephs & Co., upon the plaintiffs in London, trading there, and was there accepted and paid. London was to be considered as the place of the contract. Josephs, one of the drawers of the bill, had been discharged in 1842, under the bankrupt act of 1841.

The question arose upon an objection to Josephs as a witness, and became a principal question in the case.

The court say : "Treating London as the place of the contract, it is clear, and indeed was not disputed, that the debt thus created could not be reached and extinguished by the discharge of Josephs under the bankrupt law of the United States. No principle of international law is more firmly settled, than that a discharge of this character can have no extra-territorial operation." The late Judge Story speaks of the doctrine as well established, that the discharge of a contract by the law of a place where the contract was not made nor to be performed, will not be a discharge in any other country. (*Conflict of Laws*, § 283.)

I decide the demurrer upon a strength of authority which I am not at liberty to contest. If the point was open, I should conclude that when the law of a State will give no effect to a foreign discharge in relation to a debt contracted within its

own dominion, the rule of justice, comity, and reason, dictates that it should not support a discharge against a debt contracted elsewhere; and especially when its statute of discharge was passed after the debt was due. The reverse is a rule contrary to the all-predominant doctrine of the *lex loci contractus*, and contrary to every idea of the relations which creditor and debtor could have imagined were to exist between them, when the agreement was entered into.

The judgment will be for the defendant on the demurrer, with costs.